EDWARD J. PUKAS, *et al. vs.* LEON E. DANFORTH, *Individually and as Trustee.*

MAY 20, 1955.

PRESENT: Flynn, C. J., Baker, Condon and O'Connell, JJ.

CONDON, J. This is a bill in equity for the cancellation of a mortgage and note alleged to have been unknowingly executed by complainants as a result of false and fraudulent representations of the respondent. The bill also prays for an accounting and incidental relief. After a hearing in the superior court on bill, answer, and proof a decree was entered declaring the mortgage and note null and void and that the respondent was indebted to the complainants in the sum of $184.20. From such decree the respondent has appealed to this court.

The complainants are Edward J. and Helen M. Pukas, husband and wife, and Barney F. and Mary A. Kyzyzeski, father and mother of Mrs. Pukas, all of the town of Hopkinton in this state. The respondent, Leon E. Danforth, is engaged in the real estate business in the city of Providence. He advertised in a newspaper published in that city that he had a large sum of money available for mortgage loans. In April 1942 Mr. Pukas saw such advertisement and applied for a loan of $2,900. He called personally at respondent's office and told him he had an opportunity to purchase certain real estate in Hopkinton belonging to Christian and Minnie A. Hansen for $3,500 but he had only $600 and needed a loan for the balance of the proposed sale price. The respondent assured Pukas he could arrange a loan for the sum he needed but said he wanted to look at the property first. After inspecting it he told Pukas the property was worth $4,500 and that he was "getting a bargain." For this appraisal he charged Pukas $10.

On April 28, 1942 Pukas brought the Hansens to respondent's office. The respondent had never met them before but after talking with them about the proposed sale he asked if they would be willing to pay him a commission on the sale. They positively refused. He then drafted an agreement in which the Hansens agreed to sell and Pukas agreed to purchase the Hansen property free and clear of all encumbrances for $3,500. Sometime later he told Pukas

that he would have to pay $200 as a commission on the sale. He charged Pukas $25 for conferences with the parties and drawing such agreement. This agreement appears in evidence as respondent's exhibit 6.

On the next day Pukas went to respondent's office and expressly agreed to hire him to procure a loan of about $3,000. As compensation for such service Pukas agreed to pay him 7 per cent of the amount borrowed. Pukas also agreed to pay respondent the $200 above mentioned as a commission on the sale or for handling the real estate transaction. These terms were reduced to writing by respondent and signed by Pukas for himself and his wife. For drawing such agreement and for his conference with Pukas concerning it he charged Pukas $10. This agreement appears in evidence as respondent's exhibit 7.

Thereafter Pukas apparently could not raise the $600 in cash which he needed for the down payment but finally with the assistance of the Kyzyzeskis he raised $400. The Hansens agreed to accept that sum on May 15, 1942 and respondent then had them enter into the following written agreement:

"$400.00                  Providence, R. I., May 15th, 1942.

Received from Leon E. Danforth the sum of Four Hundred ($400.00) Dollars in part payment for our property located on the northerly side of Main street in Hope Valley, Hopkinton, R. I., balance of Thirty-one Hundred ($3,100.00) Dollars to be paid upon delivery of Warranty Deed, free and clear of all encumbrances, to said Leon E. Danforth or any one he names, at such time as said Leon E. Danforth shall choose to pay said balance.

[Signed]   Christian Hansen
[Signed]   Minnie A Hansen"

Although that agreement as drawn was between the Hansens and respondent it is clear that he was still acting for Pukas, as respondent charged him the following fees, among others, for services which he claimed to have per-

formed for Pukas in connection with obtaining such agreement: May 4, 1942 conferences with Pukas and the Hansens, $20; May 6, 1942 conference with Pukas, $10; May 13, 1942 conference with Pukas and others, $10; May 15, 1942 conferences with the Hansens, $25. On the last-mentioned date Pukas had delivered $430 to respondent, who used $400 of it to bind the bargain with the Hansens.

On June 23, 1942 respondent attended to the closing of the transaction on behalf of complainants at his office in Providence. In the meantime respondent had procured a loan of $3,400 from the Danielson Federal Savings & Loan Association to be secured by a first mortgage. After the Hansens had executed and delivered their deed to complainants they received from the representative of the loan association $3,100, the balance due on the purchase price. The complainants executed and delivered a mortgage and note for $3,400 to such representative who then paid over to respondent the balance of the loan after deducting necessary charges and expenses in arranging the mortgage. According to respondent this was $170.97. One of those charges was a broker's fee of $17. It does not appear in the evidence to whom that fee was paid. After the above papers had been executed and delivered, the Hansens and the representative of the loan association departed leaving only respondent and complainants in the office.

The respondent testified he then explained to complainants that they still owed him $300 in accordance with their agreement and that he would take a second mortgage for such sum provided they paid it promptly in weekly payments. He further testified that they signed the mortgage and note, which is the subject matter of the instant suit, and that he called in George V. Gray, a notary public, to take their acknowledgment. Gray testified that complainants signed the mortgage and acknowledged before him that it was their free act and deed. The mortgage bears his official signature and seal.

The complainants admit that the signatures on the mortgage and note are theirs but they deny they were told by respondent that he was taking a second mortgage on their property. On the contrary they testified that he told them the papers were insurance papers; that he urged them to hurry in signing such papers before the other parties arrived; that those papers were signed before and not after the real estate transaction with the Hansens; that they were the only persons in the office besides respondent at that time; and that they did not see Gray there nor had they ever seen him before he was pointed out in the courtroom at the trial.

On such sharply conflicting testimony it was peculiarly for the trial justice to determine where the truth lay. With the witnesses testifying before him he was in a much more advantageous position than we are to observe each one as he or she testified, and to decide which were credible. From his rescript it appears that he did not credit the respondent. On the contrary we think he was convinced that respondent in his dealings with complainants took unfair advantage of their ignorance and necessities although pretending to protect their interests and charging them substantial fees therefor. Apparently the trial justice was also convinced, from respondent's own itemized statement of his receipts and disbursements in connection with the whole transaction, that he had been fully compensated for such services as he had rendered in procuring the loan and attending to the closing thereof, and that in fact he had retained more than he was entitled to in the amount of $184.20.

The respondent contends that the trial justice has misconceived the evidence as to complainants' understanding of what they signed in his office. He also contends that on a full and fair consideration of all the evidence his decision is clearly wrong and fails to do substantial justice between the parties. The complainants argue to the contrary and especially point out that the important factor in the evi-

dence is the credibility of the parties. Such issue having been resolved by the trial justice in their favor, they contend that his decision is entitled to great weight and should not be disturbed unless it is clearly wrong.

From our examination of the transcript we are of the opinion that the trial justice did not misconceive the evidence as respondent claims. And we are of the further opinion that the credibility of the parties was the determinative factor in his decision. In such a case we have held that a trial justice's decision carries great weight on review here and will not be set aside unless we can find from the transcript that it is clearly wrong. *Bogdanovich* v. *Bogdanovich,* 77 R. I. 354; *Frechette* v. *Smart,* R. I., 131 A. 545. After carefully considering the evidence and bearing in mind that we lack the advantage which the trial justice had of seeing the witnesses and observing their demeanor as they testified, we are unable to say that his decision is clearly wrong.

On the contrary we think that even the cold record before us indicates that respondent took an unfair advantage of complainants who for the most part were illiterate and completely ignorant of real estate transactions and the ways of obtaining mortgage loans to finance them. In their extremity they placed their trust in respondent. In the course of their relations with him he undertook, with or without valid authority, to do more than merely procure a loan for a stipulated commission. Although not a lawyer he took it upon himself to advise them in conferences and to draw contracts and other legal instruments for them for which in every instance he charged a substantial fee.

Moreover, the record shows that in drawing the mortgage and note to cover what he claimed was due him he clearly overreached complainants and took unfair advantage of their ignorance and the reliance which they had placed in him. The nature of his conduct became definitely known

to complainants when they learned by inquiry at the office of the town clerk that there was a second mortgage on their property. As a result they retained counsel who demanded a statement from respondent of his receipts and disbursements in connection with complainants' purchase of the real estate. His statement of account is in evidence as complainants' exhibit D.

This statement alone speaks volumes in support of complainants' allegations of respondent's fraudulent dealings in his relations with them. Among other things it shows that he claimed a $30 service charge for taking the second mortgage and that he charged $18 for six months' interest in advance on the mortgage note of $300, although it could not run longer than fifteen weeks, since the note provided that the principal must be repaid in weekly installments of $20. It is obvious that taking interest of $18 in advance under such circumstances far exceeds the legal rate. There are other items in the statement which cannot be justified especially in view of the fact that respondent was pretending to attend to and protect complainants' interests for a fee.

In the face of such a record the respondent is in no position to ask this court to set aside the trial justice's decision. Such decision is based on clear and convincing evidence and we are of the opinion that it does substantial justice between the parties.

The respondent's appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Archie Smith, Raymond A. LaFazia,* for complainants.

*William H. McSoley, Jr.,* for respondent.